**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATE OF AMERICA ex rel.,** ) | |
| **LAWRENCE COLEMAN,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **No. 06 C 184** |
| ) | |
| **FRANK L. SHAW,** ) | **Judge Rebecca R. Pallmeyer** |
| ) | |
| **Respondent.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On October 12, 2000, a Cook County jury convicted Petitioner Lawrence Coleman of first-degree murder for his role in the shooting death of Jacqueline Bernaugh. Having exhausted his state appeals, Petitioner now seeks a writ of *habeas corpus* from this court. For the following reasons, his petition is denied.

<u>**FACTUAL BACKGROUND**</u>[1]

On November 29, 1998, Petitioner attended the funeral of Elizah McLachlan. McLachlan was a member of the Renegade Vice Lords, a street gang in which Petitioner had once played a leadership role. Petitioner and others testified at the trial that he was no longer a member of the gang by November 1998, but he remained friendly with many gang members. When the funeral ended, around 11 p.m., Petitioner drove home from the funeral with his young son and two gang members, Qune Vantrease and Sam Taylor. On the way, they drove past Jacqueline Bernaugh's apartment and noticed the parked cars of a rival gang, the Mafia Insane Vice Lords, outside the apartment. One of the cars belonged to Jamil Caraway, a member of the Mafia Insane Vice Lords who was dating Bernaugh's daughter.

Upon Petitioner's arrival at his home, several Renegade Vice Lords who had been at the

---

[1]    The following recitation of facts comes from the unpublished state appellate court decision unless otherwise noted. *See People v. Coleman*, No. 1-00-4022 (1st Dist. Sept. 27, 2002).

funeral congregated there. The exact details were disputed at trial, but according to Vantrease, the meeting took place in an alley behind Petitioner's home where the gang often met. Petitioner took his son inside, but then joined the others in the alley, where several drunk gang members were engaged in a discussion about killing Caraway. Many in the gang thought that Caraway was responsible for McLachlan's death. Though he had seen Caraway's car earlier that very evening, Petitioner testified that he did not mention this to the others. Petitioner also testified that the gang members often talked about hurting or killing someone but did not actually act on their threats. He acknowledges, however, that when the gang leader, nicknamed "Little," asked him whether he had any ammunition in his house, Petitioner provided Kentrell Culbreath, another Renegade Vice Lord, with six rounds of ammunition for a .380 automatic and ten rounds for a 9 millimeter. Before leaving the scene to drive his son back to his son's home, Petitioner spoke with a gang member named Edward Flowers, who asked him to look for cars belonging to members of the Mafia Insane Vice Lords still parked outside the victim's house. Flowers told Petitioner to call Little to let him know whether any of those cars were still present. Flowers told Petitioner that if the cars were still there, then it was "on tonight," a statement Petitioner "knew . . . meant they were going to go to try and shoot Jamil that night." Petitioner nevertheless agreed to call Little, and testified that he did in fact call when he saw Caraway's car still parked at Bernaugh's apartment.

Jamil Caraway and others were gathered inside Jacqueline Bernaugh's apartment that night. Among those were Jacqueline's daughter Shelly and Alice Larue. Shelly and Larue testified that at around 1 a.m., they heard people gather outside the apartment building. Jacqueline told them to turn the lights off, and Shelly and Larue went to the window and looked out from behind the curtain. When talking to the police later that night, Larue told them that she did not see anything as she looked outside. More than one year later, however, in March 2000, Larue gave a statement to the police in which she claimed that she recognized two of the men outside as Sam Taylor and Octavius Sims, both of whom she knew to be Renegade Vice Lords. She testified at Petitioner's

trial that she saw those two as well, and she explained that she had initially lied to the police out of a fear of retribution from the gang. In any event, after looking out from the behind the curtain, Larue and Shelly walked away from the window to tell Jamil what they saw, just as Jacqueline approached the window. Jacqueline pulled back the curtain, and a number of shots rang out; when Larue turned back, she saw Jacqueline lying on the ground in a pool of blood. The police responding to the scene found a mix of 9 millimeter, .380 automatic, and shotgun shells outside of the apartment building.

It is undisputed that Petitioner was not outside Bernaugh's apartment at the time of the shooting. After dropping his son off, Petitioner was on his way home when he was stopped by the police outside Bernaugh's apartment, who told him that someone had been shot. The next night, Petitioner spoke to his cousin, Eddie Coleman, a Renegade Vice Lord who had been outside the victim's apartment the night before. According to a statement Petitioner gave to police following his arrest, Eddie told Petitioner that he saw the curtain inside the victim's apartment move. Worried that a gunman was behind the curtain, Eddie and several others started shooting into the apartment.

On December 12, 1998, police arrested Petitioner in his home. According to affidavits they filed later, Petitioner's uncle, Jimmie Coleman, and girlfriend, Monetta Wade, heard Petitioner tell the police that he wanted to speak with his attorney, David Wiener. (Ex. 3 to Am. Pet.) Seventeen hours later, while in custody, and without the presence of counsel, Petitioner admitted to his role in the shooting.

On December 28, 1999, the court held a hearing on Petitioner's motion to suppress his confession. Petitioner testified that he found out that the police were looking for him in connection with the Bernaugh killing on December 12 and called his lawyer, David Wiener, that morning. At about 11:30 a.m., the police arrested Petitioner at his home and read him his *Miranda* rights. Upon arriving at the police station, Petitioner claims that he requested to speak with his lawyer, but

Chicago Police Detective Philip Graziano refused the request, referring to Mr. Wiener as a "shyster." Petitioner testified that he made between ten and twenty further requests to speak to his lawyer, but he was never allowed to use the phone. According to Petitioner, Graziano eventually brought in two assistant state's attorneys ("ASAs") and told Petitioner that these were the two with whom he was going to "make a deal," although one of the ASAs told him that they were not going to make a deal. Before Petitioner gave his statement, which came nearly seventeen hours after his arrest, he claims that he asked to speak to an attorney again, but the ASAs refused.

Both Graziano and ASA Nancy Nazarian provided a different account at the suppression hearing. Neither of them recall Petitioner's ever requesting to speak to a lawyer generally or Wiener in particular. In addition, both denied that Graziano suggested that the state intended to negotiate a deal with Petitioner. Both testified, in fact, that Nazarian was the only ASA who met with Petitioner. Graziano acknowledged that he did speak to Wiener on December 12, but claims that they discussed one of Coleman's co-defendants, whom Wiener was also representing, and not Petitioner.[2] For his part, Wiener claims that he did call the police station that afternoon, prior to Petitioner's confession, and told Graziano to stop questioning Coleman. This evidence was not introduced at the hearing, however; Wiener mentioned this conversation for the first time in an affidavit he attached to Petitioner's motion for a new trial after Petitioner's guilty verdict. Given the consistency of Graziano's and Nazarian's accounts, the trial court deemed them credible and denied Petitioner's motion to suppress the statement he made to Nazarian.

Petitioner's trial began October 11, 2000. At the conclusion of the two-day trial, a jury found Petitioner guilty of first-degree murder, and he was sentenced to twenty-eight years in prison. Petitioner appealed, arguing that his statement to Nazarian should have been suppressed; that

---

[2]     The record does not reveal whether Wiener continued to represent any of Petitioner's co-defendants, nor has Petitioner suggested that Wiener's representation of any co-defendants created a conflict of interest.

Wiener provided ineffective assistance of counsel by failing to offer evidence at the suppression hearing that he called the police station on December 12; that Petitioner was not proven guilty beyond a reasonable doubt; and that the sentence was excessive. The Illinois Appellate Court affirmed, concluding that Petitioner's *Miranda* rights were not violated because even if Wiener called the police, such a call would not require police to stop questioning Petitioner. (Ex. D.) Additionally, the court determined that the evidence was sufficient to support the verdict and that the trial court did not abuse its discretion in sentencing Petitioner to twenty-eight years. (Ex. D.) Petitioner's Petition for Leave to Appeal was denied by the Illinois Supreme Court. (Ex. F.)

In 2003, Petitioner filed a postconviction petition pursuant to 725 ILCS 5/122-1, which permits state prisoners to seek relief for violations of the United States or Illinois Constitutions. 725 ILCS 5/122-1(a). In this petition, Petitioner argued that Wiener provided ineffective assistance of counsel at the suppression hearing by failing to present the testimony of his uncle and girlfriend, and attached the affidavits of those two witnesses. (Ex. G.) The postconviction petition was denied by the trial court as "frivolous and patently without merit," and the Illinois Appellate Court affirmed, concluding that Wiener's decision not to present the testimony in question was a matter of strategy. (Ex. J at 9.) The Illinois Supreme Court again denied review. (Ex. M.) Petitioner then filed a second postconviction petition in state court[3], which was summarily dismissed; he appealed, again raising as his sole issue the claim that his counsel was ineffective for failing to call witnesses at the suppression hearing. The Appellate Court affirmed on the grounds that Petitioner was collaterally estopped from retrying the issue, and Petitioner did not appeal that decision to the state supreme

---

[3]     Illinois law "contemplates the filing of only one petition," and "a defendant faces immense procedural default hurdles when bringing a successive post-conviction petition." *People v. Tenner*, 206 Ill. 2d 381, 392, 794 N.E.2d 238, 245 (2002). In general, the court will grant leave to file a second postconviction petition "only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure." 725 ILCS 5/122-1(f). The state courts did not rigorously enforce this standard, however, and Petitioner's successive petitions were ultimately dismissed on other grounds than 725 ILCS 5/122-1(f).

court. (Ex. N.)  In September 2005, Petitioner filed a third postconviction petition, this time alleging that the state knowingly used perjured testimony at trial, as well as additional claims of ineffective assistance of trial and appellate counsel for a variety of reasons.  Petitioner's counsel moved to withdraw from the case pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), which permits appointed counsel to withdraw from a case in which there are no meritorious issues.  The trial court granted counsel's *Finley* motion, finding the case to be without merit, and the Illinois Appellate Court affirmed.  (Ex. Q.)  The Illinois Supreme Court denied review.  (Ex. S.)

Petitioner then petitioned this court for a writ of *habeas corpus*.[4]  Plaintiffs' Amended Petition raised four main claims: (1) his confession was obtained in violation of *Miranda*; (2) trial counsel was ineffective for several reasons; (3) the state knowingly used perjured testimony, both before the grand jury and at trial; and (4) he is actually innocent.  Petitioner later supplemented his petition with an additional claim (5) that the state prosecutor withheld exculpatory evidence in violation of *Brady*.

## DISCUSSION

A court will grant *habeas* relief if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  A state court decision is contrary to clearly established federal law only if the "state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[, or] if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that reached by the Court]."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  To show that the state court unreasonably applied clearly established federal law, a petitioner must demonstrate that "the state

---

[4]     Petitioner actually filed his original petition on January 12, 2006, while his third postconviction petition was still pending in the state system.  On his motion, the court stayed the petition until July 2, 2007.

court's application of clearly established federal law [is] objectively unreasonable." *Id.* at 408. The court may also issue a writ of *habeas corpus* if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" 28 U.S.C. § 2254(d)(2). State court factual findings, however, are "presumed to be correct," and a petitioner can overcome that presumption only with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). With these principles in mind, the court turns to Petitioner's five claims.

## I.   *Miranda*

Petitioner first argues that he is entitled to *habeas* relief because his confession was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Petitioner claims that he invoked his right to counsel several times during the course of his seventeen-hour interrogation, but was repeatedly refused the opportunity. *See, e.g.*, *United States v. Briggs*, 273 F.3d 737, 740 (7th Cir. 2001) ("Once a suspect invokes the right to counsel, the police must cease all interrogation until counsel is present, unless the accused himself initiates further communication." (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981))). Petitioner also claims that he called his lawyer the morning he was arrested; that he was denied use of a phone during his interrogation; and that the police continued interrogating him despite Wiener's request that they stop.[5]

Graziano and Nazarian disputed most these factual assertions at the suppression hearing. Specifically, both denied that Petitioner ever requested to speak to his counsel, and Graziano claimed that his conversations with Wiener that day concerned his representation of another defendant in the case. The trial court concluded that Graziano and Nazarian's testimony was more credible than Petitioner's and denied the motion to suppress. (Ex. T at A-41.) The Appellate Court

---

[5]    Petitioner also stated that, outside the presence of his counsel, one of the detectives told him that the ASA would make a deal with Petitioner in exchange for his statement. Even if true—and the state court found Graziano's testimony more credible than Plaintiff's—this fact has no prejudicial effect because Petitioner admits that he was not actually offered a plea deal without his counsel.

affirmed that conclusion on direct appeal, even after considering Wiener's affidavit stating that he did in fact call the station that day and told the police to stop questioning Petitioner. (Ex. D at 16.)

Nothing here justifies *habeas* relief. The trial court's denial of the motion to suppress was based upon its credibility determination, and "28 U.S.C. § 2254(d) gives federal *habeas* courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). As noted, the only new piece of evidence not considered by the trial court in making this determination was an affidavit from Wiener himself claiming that he called the station the day Petitioner was arrested and told Graziano to cease questioning the Defendant. (Ex. D at 14.) This affidavit was first presented at Petitioner's motion for a new trial, and was considered by the Illinois Appellate Court on direct review. That court observed that, under Illinois law, a lawyer's request over the telephone is insufficient to require police to cease questioning. (*Id.* at 15 (citing *People v. Chapman*, 194 Ill. 2d 186, 213, 743 N.E.2d 48, 66 (2000) ("Only through physical presence may the police verify, through proper identification, that the person in front of them is the [accused's attorney].").)

When reviewing the state court's judgment, this court will not grant a writ of *habeas corpus* unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Petitioner can point to no case from the Supreme Court to support the proposition that police must cease the interrogation of a suspect if they receive a phone call from someone claiming to be the suspect's lawyer. The Seventh Circuit has noted that where no Supreme Court precedent exists, the petitioner "faces an impossible hurdle" in meeting the *habeas* standard. *Lockhart v. Chandler*, 446 F.3d 721, 724 (7th Cir. 2006). Given the trial court's unassailable credibility determinations and the lack of any Supreme Court precedent regarding phone calls from counsel, there is no basis for this court to conclude that the state court unreasonably applied clearly established Federal law when deciding Petitioner's *Miranda* claims.

## II.    *Brady*

In February 2008, Petitioner filed a supplemental petition, alleging that the state violated his rights by failing to disclose that Alice Larue testified at Petitioner's trial pursuant to a deal with the state.  *See Brady v. Maryland*, 373 U.S. 83 (1963); *see also Giglio v. United States*, 405 U.S. 150 (1972).  Petitioner bases his allegations on testimony Larue provided at the trial of Octavius Sims, who was also tried and convicted for his role in Bernaugh's murder as one of the shooters.  At Sims's trial, but not Petitioner's, Larue claimed that she did not tell police the truth about seeing two gang members outside Bernaugh's apartment on the night of the murder until "after she was offered protection, including relocation."[6]  *People v. Sims*, 358 Ill. App. 3d 627, 631, 832 N.E.2d 237, 240 (1st Dist. 2005).  She somewhat contradicted the existence of a deal, however, as later in her own testimony in Sims's trial she "admitted that she already had relocated to another state before she was offered protection."  *Id.*  Whether Larue actually did make any deal with the government is therefore speculative at best.

At Petitioner's trial, Larue testified in a jail jumpsuit and admitted that she was currently incarcerated at the Cook County Jail for violating her probation from a 1997 conviction for possession of a controlled substance with intent to deliver.  (Ex. T at C-29.)  She also testified that when she gave her statement to the ASA in 2000, she was subject to an arrest warrant that had been issued for the probation violation.  (*Id.* at C-49.)  She stated that after giving her statement identifying Taylor and Sims, an ASA accompanied her to a proceeding regarding her probation violation, and she was released on a bond.  (*Id.*)  Larue testified at Petitioner's trial that she gave her statement freely and did not make a deal with the state's attorney's office that she would

_____

[6]       Petitioner also provided the affidavit of Kentrell Culbreath, one of Petitioner's co-defendants, claiming that Larue received relocation fees in exchange for her testimony.  (Ex. A to Supp. Pet.)  This information, in addition to being unsupported hearsay, was never submitted to a state court for review, and the court has no basis to order an evidentiary hearing or otherwise consider the claim.  28 U.S.C. § 2254(e)(2).  In any event, as the ensuing discussion makes clear, the truthfulness of Culbreath's allegations are immaterial to the disposition of Petitioner's claim.

provide testimony in exchange for a bond.  (*Id.* at C-50.)  Larue made no mention of any promises of relocation made by the government attorneys.

Petitioner claims that the state violated his constitutional rights by failing to disclose that Larue had made a deal with the state.  "[T]he Government has a duty to disclose evidence favorable to the defendant, whether the evidence is exculpatory or tends to impeach a Government witness." *United States v. Banks*, 546 F.3d 507, 509 (7th Cir. 2008) (citing *Strickler v. Greene*, 527 U.S. 263, 280 (1999)).  Petitioner did not raise this claim at any state proceeding; accordingly, it is procedurally defaulted unless he can show both cause for not raising the issue earlier and prejudice resulting from that failure, or that failing to consider the claim "would result in a fundamental miscarriage of justice."  *See Crockett v. Hulick*, 542 F.3d 1183, 1193 (7th Cir. 2008).

Petitioner cannot show any prejudice resulting from the state's alleged misconduct.  Even assuming that a deal existed between Larue and the state—a generous assumption based on the evidence presented thus far, but one that could potentially be proven at an evidentiary hearing—Petitioner would not be entitled to a new trial.  A failure to disclose favorable evidence entitles a petitioner to a new trial only if the failure "resulted in denial of a fair trial." *Banks*, 546 F.3d at 510 (citing *Strickler*, 527 U.S. at 281-82).  Here, ample evidence exists to convict Petitioner of murder even without Larue's testimony.  Petitioner claims that Larue's testimony was the only link actually placing Renegade Vice Lords at the scene of the shooting, but Petitioner's own confession also implicated the gang members in the shooting.  (Ex. T at C-177.)  Graziano also recalled Petitioner's statement that Eddie Coleman told Petitioner that he and others shot into Bernaugh's apartment.  (*Id.* at C-121.)  Furthermore, nothing in Larue's testimony touched upon the most critical pieces of evidence against Petitioner: namely, that he both provided ammunition to individuals he knew were intent on hurting and killing Caraway, and then called Little to inform him of Caraway's whereabouts after providing the ammunition.  Larue's testimony in Petitioner's trial was essentially corroborative, and provided no direct evidence of Petitioner's guilt; indeed, Larue did not even see

10

Petitioner on the night of the murder. Therefore, even if Larue had worked out a cooperation deal with the government and the government did not disclose that deal to Petitioner, there was no impact on the result of the trial. The court concludes that Petitioner did not suffer prejudice and that this court's failure to consider the claims will not result in a miscarriage of justice. Petitioner's *Brady* claim is procedurally defaulted.

Petitioner also claims the state knowingly presented other perjured testimony of Larue at his trial. Petitioner has attached two pages of the transcript from Sims's 2001 trial to his supplementary petition in support of this claim, and these pages do show a couple of trivial inconsistencies between Larue's testimony at Petitioner's trial and her testimony at Sims's trial. Specifically, in Sims's trial, Larue spelled her name with two "r's" and stated that she was twenty-one years old, whereas she spelled her name with one "r" and claimed to be forty in Petitioner's trial. Petitioner claims that this was potential impeachment information that Petitioner could have used at the trial to discredit Larue, but Petitioner has not shown that this would have had any impact on the outcome of the trial. The court further notes that Petitioner also cannot show a cause for his failure to raise this complaint earlier, because this information would have been available to him shortly after the conclusion of Sims's 2001 trial. However odd these inconsistencies may be, they did not cause Petitioner any prejudice and are also procedurally defaulted.

Finally, Petitioner objects to a passage in Respondent's Response to the Supplemental Petition as improper. Petitioner apparently filed a complaint with the state ethics board alleging that Jake Rubinstein, the prosecutor in his trial, withheld information about a deal with Larue. For reasons that are not entirely clear, Petitioner attached Rubinstein's response to the allegation, dated November 28, 2007, to his Supplemental Petition. In its response in this court, Respondent referred to Rubinstein as *Petitioner's* counsel and stated that the letter "completely eviscerates Petitioner's *Brady* claim." (Resp. to Supp. Pet. at 9.) This reference to the prosecutor as representing Petitioner was careless and inaccurate. Although the court therefore sustains

Petitioner's objection, the inaccurate reference does not prejudice him; it appears only once in Respondent's response and the court presumes it was not the product of bad faith. In any event, it does not alter the above analysis, namely, that even assuming information was withheld from Petitioner regarding Larue, he was not prejudiced as a result.

## III.    Ineffective Assistance of Counsel

Petitioner next contends that he was provided with ineffective assistance of counsel at several points. To demonstrate ineffective assistance of counsel, a petitioner must show both that counsel's performance was deficient and that he was prejudiced as a result. *Nunez v. United States*, 546 F.3d 450, 453 (7th Cir. 2008). For representation to be deficient, counsel's performance must fall "below an objective standard of reasonableness," and courts "indulge a strong presumption" that counsel's performance was reasonable. *Strickland v. Washington*, 466 U.S. 668, 688-89 (1984). Petitioner bears the burden of proving both elements of an ineffective assistance claim, *see Stevens v. McBride*, 489 F.3d 883, 892 (7th Cir. 2007), but a court need not examine the two elements in order and may dispose of a case where no prejudice has been shown without addressing the adequacy of counsel's performance. *See Strickland*, 466 U.S. at 697 ("The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."). Finally, Petitioner "must do more than show that he would have satisfied *Stirckland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), . . . he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). With these standards in mind, the court considers Petitioner's various ineffectiveness claims.

**A.      Testimony at Suppression Hearing**

Petitioner claims, first, that Wiener provided ineffective assistance at the suppression hearing by failing to call favorable witnesses.  First, Petitioner argues that Wiener should have testified or made an offer of proof at the hearing stating that he called the police station prior to Petitioner's making his statement and told Graziano to stop questioning Petitioner.  Second, Petitioner also argues that counsel should have called Jimmie Coleman and Monetta Wade, whose affidavits attached to the Petition state that both would have testified that they heard Petitioner invoke his right to counsel when he was arrested.

Petitioner raised the claim with regard to Wiener's testimony on direct appeal from his trial. The state appellate court concluded that Wiener's decision to make no offer of proof did not violate the *Strickland* standard.  (Ex. D at 17-18.)  The court agrees that this was a reasonable application of the law.  First, given the presumption that counsel's performance was reasonable, courts will not second guess decisions, such as who to call as a witness, that can be characterized as "sound trial strategy."  *See Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001) (citing *Strickland*, 466 U.S. at 689).  Second, as discussed above, Petitioner was not prejudiced by Wiener's failure to testify, as his testimony would not have altered the state court's decision that Petitioner's confession complied with *Miranda*.  *See Chapman*, 194 Ill. 2d at 213, 743 N.E.2d at 66 (phone call does not trigger right to counsel).  The court thus agrees with the state court that Wiener's decision not to testify did not constitute ineffective assistance of counsel.

Petitioner did not make his argument concerning Coleman and Wade until his first postconviction appeal, when he submitted the affidavits from his uncle and girlfriend.  Jimmie Coleman, Petitioner's uncle with whom Petitioner lived, would have testified that he heard Petitioner tell the police that he wanted to speak with his attorney, David Wiener.  (Ex. 3 to Am. Pet.)  Jimmie also stated that he informed Wiener that he heard Petitioner invoke his right to counsel at the house, although his affidavit is not entirely clear as to when he spoke to Wiener.  (*Id.*)  Monetta

13

Wade, Petitioner's girlfriend, would have testified that she called the Petitioner's home the day

Petitioner was taken into custody. (Ex. 4 to *id.*) She claims that the phone was first answered by

a male voice that she did not recognize who told her to call back later. (*Id.*) She called back, and

Jimmie Coleman answered the phone. (*Id.*) Wade claims to have heard Petitioner in the

background asking the police if he could call his lawyer. (*Id.*) These affidavits are insufficient to

alter the outcome. Again, the court entertains a generous presumption that counsel's trial strategy

was reasonable. *See Hough*, 272 F.3d at 891. Moreover, where one witness was Petitioner's

uncle and the other was his girlfriend, the testimony the two provided would have been easily

subject to impeachment given their close relationships with Petitioner. *See Bergmann v.

McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995) ("As a matter of trial strategy, counsel could well

decide not to call family members as witnesses because family members can be easily impeached

for bias."). There is no reason to think that the testimony offered by these two interested witnesses

would have altered the court's credibility determination, and the state appellate court's conclusion

to that effect is consistent with federal law.

### B.      Credit for Time Served

Petitioner claims that he is entitled to credit for seven months and twenty-five days served

prior to trial, and that his counsel provided ineffective assistance for failing to raise this issue. The

transcript does note a comment made by Petitioner's counsel at the end of the sentencing hearing

in which counsel states that he will inform the court the exact number of days for which Petitioner

deserves credit. (Ex. T at E-16.) According to Petitioner, counsel never did so. Petitioner has not

explained how this claim could support a new trial, but the court need not make that determination

because Petitioner has procedurally defaulted the claim. Petitioner first raised the claim in his third

postconviction petition, but did not reiterate it in his brief before the appellate court in response to

his counsel's motion to withdraw. (Exs. O & P.) The state appellate court therefore did not have

the opportunity to consider the question. Petitioner has, therefore, failed to "invok[e] one complete

round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Petitioner has suggested no cause for this failure, and the claim is procedurally defaulted.[7]

### C.     Untimely Indictment

Petitioner next argues that his counsel was ineffective for failing to move for dismissal of the indictment as untimely. In Illinois, every person in state custody who is accused of a felony is entitled to a preliminary examination unless the grand jury returns an indictment within thirty days. 725 ILCS 5/109-3.1(b). Petitioner was taken into custody on December 12, 1998, but was not indicted until January 14, 1999, thirty-two days after his arrest. The appellate court dismissed the claim on its merits. (Exs. R, Q.) Petitioner is not entitled to *habeas* relief on this ground because even if this was a mistake on the part of Petitioner's counsel, Petitioner was not prejudiced as a result. When an indictment is dismissed for failure to timely bring the indictment in Illinois, the state may obtain a new indictment on the same charge. 725 ILCS 5/114-1(e). The failure of Petitioner's counsel to move for dismissal of the indictment thus did not prejudice Petitioner because there is no reason to doubt that he would have been indicted again, and no reason to imagine the outcome of the trial would have been any different. *See People v. Ladd*, 294 Ill. App.3d 928, 932, 691 N.E.2d 896, 901 (5th Dist. 1998) ("Assuming that the State violates section 109-3.1 . . . the violation would not result in defendant's release." (citing *People v. Clarke*, 231 Ill. App. 3d 504, 596 N.E.2d 872 (5th Dist. 1992))).

---

[7]     Without formally addressing this argument, the court notes that Petitioner offers no support for his suggestion that he is entitled to credit for seven months and twenty-five days in custody. The court's own brief investigation suggests he spent far less time in custody prior to trial. His lawyer estimated at sentencing that Petitioner was entitled to credit for "approximately 100 days," without explaining that calculation. (Ex. T at E-16.) The court was able to review records from Stateville Correctional Center that show Petitioner was in custody at Cook County Jail for just forty-nine days.

Petitioner remains free to seek any remedy that may be available through the Illinois prison system.

### D. Veracity of Petitioner's Confession

Petitioner attached an affidavit to his Amended Petition in which he stated that several statements in his confession were false and that he asked his attorney to present evidence that they were false. Specifically, Petitioner claims that he stated in his confession that he had graduated from high school when he actually possesses a High School Equivalency Certificate; that he was not actually driving his girlfriend's car on the night of the shooting; that he never called Little to tell him that the cars were still there; and that Eddie Coleman did not inform him of the details of the shooting on the phone. According to Petitioner, Wiener's failure to introduce evidence that these elements of his confession were false constituted ineffective assistance of counsel.

The court concludes that Petitioner's counsel acted well within his discretion not to introduce evidence that Petitioner lied in his confession. Notably, Petitioner does not argue that the police incorrectly transcribed the confession or that he never said the things cited above; rather, he claims that he himself made misstatements in his confession that his counsel should have pointed out. If Wiener had done as Petitioner wishes and introduced evidence that Petitioner lied in his confession, it might have hurt Petitioner's case by undermining his credibility in front of the jury. At any rate, when the defendant chooses to take the stand, counsel's decision not to impeach him with prior untruthful statements is a question of trial strategy that the court will not second guess. *See Hough*, 272 F.3d at 891 (citing *Strickland*, 466 U.S. at 689).

As for the specific allegations that Petitioner claims were untrue, two—the GED certificate and whose car Petitioner was driving—are collateral matters that do not affect Petitioner's guilt or innocence. Petitioner's other two claims, especially whether he called Little to tell him that Caraway's car was still there, could potentially affect his guilt since he was convicted under an accountability theory. In support of his claim that these phone calls did not happen, Petitioner attached his cell phone bill from November 1998, which he claims shows only a phone call to Tiffany Williams in the early hours of November 30; he also attached an affidavit from Williams

claiming that the number is in fact hers.  (Exs. 11 & 12 to Am. Pet.)

Petitioner's argument that his attorney should have challenged these statements in his confession is a non-starter.  Any such challenge would have suggested Petitioner was lying on the stand at trial, where he admitted on cross-examination both that he called Little to tell him that Caraway's car was there and that he talked to Eddie Coleman about the details of the shooting. (Ex. T at D-127:17-18 ("Q: You called back to Little on your cell phone? A: Correct."); D-133:20-21 ("A: The next day, yes, I did talk to Eddie.  Yes, I did.").)  Wiener thus could not have introduced evidence that showed Petitioner lied in his confession without also showing that Petitioner perjured himself in front of the jury; Wiener's choice not to do so was reasonable.  Counsel's decision not to introduce evidence that suggested Petitioner might have lied twice under oath therefore was a sound one that does not entitle Petitioner to *habeas* relief.

### E.     Larue's "Deal"

In his Supplemental Petition, Petitioner alleges that counsel was ineffective in failing to investigate whether Larue made a deal with the prosecution and for failing to impeach her.  These claims were not made in any of Petitioner's state postconviction petitions, and therefore are procedurally defaulted unless there is a cause for the failure to raise and prejudice resulting from that failure.  Neither are present here.  Petitioner claims that there is cause for his failure to raise the claim because he only recently learned about Larue's alleged deal with the prosecution.  The testimony of Larue that Petitioner claims establishes the existence of a deal came in 2001, however, at Sims's trial, and so Petitioner could have learned of this alleged inconsistency earlier. *See, e.g.*, *Montgomery v. Meloy*, 90 F.3d 1200, 1203-04 (7th Cir. 1996) (cause not established when petitioner "knew or should have known" of the claim in his earlier postconviction petitions). Additionally, as discussed above, Larue's testimony was cumulative and any impeachment it may have been subject to would not have altered the jury verdict.  This claim from his supplemental petition is therefore procedurally defaulted.

## IV.    Knowing Use of Perjured Testimony

Petitioner next contends that the state twice knowingly offered perjured testimony.  First, Petitioner claims that the state knowingly presented the perjured testimony of Edward Flowers before the grand jury; second, Petitioner argues that the state knowingly used Alice Larue's perjured testimony at trial.  Petitioner relies on the Supreme Court's holding in *Napue v. Illinois*, 360 U.S. 264, 269 (1959), that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fail under the Fourteenth Amendment."  With this general principle in mind, the court considers Petitioner's two allegations.

Petitioner attached to his amended Petition an affidavit from Flowers in which Flowers asserts that he made a deal with the police to lie before the grand jury in exchange for staying out of jail.  The affidavit does not specify what false statements Flowers made to the grand jury.  In any event, Flowers did not testify at Petitioner's trial, and his statements to the grand jury were not considered by the petit jury in convicting Petitioner of first-degree murder.  The Supreme Court has stated that the harm caused by errors in grand jury procedure are rendered harmless by a

> petit jury's subsequent guilty verdict[, which] means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*United States v. Mechanik*, 475 U.S. 66, 73 (1986).  *Napue*'s prohibition on the state's knowing use of false evidence thus does not apply to this claim, because even if Flowers did provide false testimony to the grand jury, Petitioner's conviction was not "obtained through [its] use." *Napue*, 360 U.S. at 269.  The facts alleged by Petitioner arguably go farther than those in *Mechanik*, as Petitioner is alleging a violation of procedural due process based on willful prosecutorial misconduct, whereas *Mechanik* dealt with the violation of a somewhat technical Rule of Criminal Procedure.  Nonetheless, Petitioner is unable to provide any authority from the United States Supreme Court to support the proposition that prosecutorial misconduct in front of a grand jury

18

requires dismissal of the indictment. 28 U.S.C. § 2254(d)(1); *see also Goodrich v. Hall*, 448 F.3d 45, 49 (1st Cir. 2006) ("[T]he Supreme Court has not defined the circumstances in which impropriety involving even a federal grand jury can ever lead to dismissal of an indictment once a petit jury had returned a verdict of guilt."). Petitioner is not entitled to *habeas* relief on this claim because the state court's rejection of this claim was consistent with, and did not unreasonably apply, Supreme Court precedent.

Unlike Flowers, Larue provided perjured testimony during the trial itself, according to Petitioner.

> [W]hen a defendant seeks a new trial on the ground that the government used perjured testimony, he "must establish (1) that the prosecution indeed presented perjured testimony, (2) that the prosecution knew or should have known of the perjury, and (3) that there is some likelihood that the false testimony impacted the jury's verdict."

*Tayborn v. Scott*, 251 F.3d 1125, 1130 (7th Cir. 2001) (quoting *United States v. Thompson*, 117 F.3d 1033, 1035 (7th Cir. 1997)). As noted above, Petitioner claims that the state knowingly presented Larue's perjured testimony regarding her age and the existence of a deal with the prosecution. Petitioner has offered little more than speculation to support his assertion that the testimony, especially regarding the alleged deal, was in fact untrue. Regardless of the truth or falsity of those statements, however, there is little doubt that the testimony did not impact the jury's verdict. *See United States v. Agurs*, 427 U.S. 97, 103 (1976) (false testimony is only considered material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury"). In *Tayborn*, for instance, the court denied a *habeas* petition where a prosecution witness provided inconsistencies at trial concerning "collateral" matters. *Tayborn*, 251 F.3d at 1130. The court concluded that there was no "reasonable likelihood that the jury would have reached any different conclusion without the allegedly false testimony," especially because the testimony provided by the witness in question "was merely cumulative to that of the state's chief witness." *Id.* at 1131. Similarly, as discussed above, Larue's testimony corroborated other

19

testimony—including Petitioner's own testimony—that placed Renegade Vice Lords at the scene of the crime. Her testimony did not touch at all upon Petitioner's own volitional acts that supported the murder charge, such as his provision of both ammunition and information to the shooters. Therefore, even if the prosecution had knowingly presented perjured testimony, that testimony had no effect upon the jury's verdict and cannot be the grounds of granting Petitioner a new trial.

## V. Actual Innocence

Finally, Petitioner claims he is entitled to *habeas* relief because he is actually innocent. Petitioner points to affidavits provided by some of the individuals involved in the events of November 30. Those affidavits, he claims, show that he did not in fact inform his friends that Jamil was at 82nd and Exchange. The court first notes that this evidence does not contradict the evidence that Petitioner, as he testified, provided Little with ammunition for a .380 automatic and a 9 millimeter and knew that Little and others were headed to look for Jamil to "hurt and kill" him. In any event, the court has no reason to consider the persuasiveness of this evidence because "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal *habeas* relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("Federal courts are not forums in which to relitigate state trials."). "This rule is grounded in the principle that federal *habeas* courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Herrera*, 506 U.S. at 400. Absent a showing that his trial was affected by any constitutional errors, this court is not free to reconsider evidence relating to Petitioner's guilt or innocence.

## VI. Trial transcripts

Petitioner has also filed a motion with this court seeking the trial transcripts of Kentrell Culbreath from October 2008, which Petitioner claims will show that the government paid Larue for her testimony. Having reviewed the attached affidavits of both Petitioner and Culbreath, the court

concludes that even if the documents did show what Petitioner claims, they would not prejudice the outcome of the trial. For the reasons discussed above, Larue's testimony was not essential to Petitioner's guilt. Whatever the transcripts might say, they cannot undermine confidence in the jury's verdict and thus cannot provide a basis for *habeas* relief.

## **CONCLUSION**

Petitioner Lawrence Coleman's Amended Petition for a Writ of *Habeas Corpus* [24] is denied. In addition, Petitioner's Motion to Add Affidavit Where Petitioner Accidentally Left Off His Motion for Transcripts [52] and Motion to Supplemental Motion for Co-Defendant transcripts [53] are granted, but Petitioner's Motion for Trial Transcripts of Co-Defendant [50] is denied.

ENTER:

Dated: July 1, 2009
                                          _____
                                          REBECCA R. PALLMEYER
                                          United States District Judge